Richard D. STEIGMANN, Plaintiff,

v.

THE DEMOCRATIC PARTY OF ILLINOIS, Rod R. Blagojevich, Joseph Handley, Randal E. Thomas, and John G. Sheedy, in their individual capacities, Defendants.

No. 05 C 0336.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 20, 2005.

John P. Derose, John P. Derose and Associates, Burr Ridge, IL, Jessica Rae Hill, John P. Derose & Associates, Hinsdale, IL, for Plaintiff.

Michael James Kasper, Fletcher Topol & O'Brien, William J. Harte, William J. Harte, Ltd., Jeffrey D. Colman, Christopher Vincent Parente, David Eric Jimenez–Ekman, John R. Storino, Jenner & Block, LLC, Samuel D. Brooks, United States Attorney's Office, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

ST. EVE, District Judge.

Plaintiff Richard D. Steigmann filed suit against the Democratic Party of Illinois, Governor Rod R. Blagojevich, Joseph Handley, Randal E. Thomas, and John G. Sheedy, alleging that Defendants are liable under 42 U.S.C. § 1983 for retaliatory discharge (and conspiracy to accomplish the same) in violation of the First and Fourteenth Amendments to the United States Constitution. In short, this case, like many that are currently pending, "deals with the long-running saga of political patronage hiring and firing in Illinois." *Thompson v. Illinois Dept. of Prof. Reg.*, 300 F.3d 750, 751–52 (7th Cir.2002). Currently before the Court, are the Defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants Defendants' motions.

## BACKGROUND

The Complaint alleges the following facts:

### I. The Parties

Plaintiff Richard D. Steigmann ("Steigmann" or "Plaintiff") is an Illinois resident (R. 35–1, Am. Compl. at ¶ 2) who claims to be a "well-known, active, and prominent" member of the Republican Party. (*Id.* at ¶ 10.) Steigmann is an elected City of Champaign Precinct Committeeman of the Republican Party of Illinois. (*Id.* at ¶ 9.) Steigmann also serves as the Champaign County Republican Party District Coordinator for Champaign County District 4 and is responsible for the direction of the political activity of the Republican Precinct Committeemen and their required attendance at all Republican Party functions. (*Id.* at ¶ 11.) In 1999 and 2000, Steigmann served as a Republican member of the Champaign County Board, representing a City of Champaign District. (*Id.* at ¶ 12.) Steigmann's political activities on behalf of the Republican Party included serving as Campaign Manager for Jerry Schweighart, as Campaign Manager in 1999–2000 for Circuit Court Judge Michael Q. Jones, and as Campaign Coordinator in 1999–2000 for Congressman Tim Johnson. (*Id.* at ¶ 13.) In addition, Steigmann's brother, the Honorable Robert J. Steigmann, is a judge affiliated with the Republican Party (and successfully ran under its banner in 1994) who currently sits on the Fourth District Appellate Court for the State of Illinois. (*Id.* at ¶ 14.)

Defendant Democratic Party of Illinois (the "Democratic Party") is a political organization registered in the state of Illinois. (*Id.* at ¶ 3.) Defendant Rod R. Blagojevich ("Governor Blagojevich") is the current governor of Illinois and a member of the Democratic Party. (*Id.* at ¶ 4.) Defendant Joseph Handley ("Handley") is the Deputy Chief of Staff to Governor Blagojevich, the "patronage coordinator" between the Democratic Party and Governor Blagojevich, and a member of the Democratic Party. (*Id.* at ¶ 5.) Defendant Randal E. Thomas ("Thomas") is the Adjutant General of Illinois and a member of the Democratic Party.[1] (*Id.* at ¶ 6.) The Adjutant General is a cabinet-level position of the Executive Branch of the Illinois government and is appointed by the governor.[2] (*Id.* at ¶ 20.) Defendant John G. Sheedy ("Sheedy") is the Director of Special Staff for the Illinois Army and Air National Guard. (*Id.* at ¶ 7.)

### II. Steigmann's Employment with Lincoln's Challenge Academy

On or about January 3, 2000, Illinois Department of Military Affairs ("IDMA") hired Steigmann to serve as the Community Relations Specialist for Lincoln's Chal-

---

1. The Court will refer to the defendants, collectively, as "Defendants." In addition, because Governor Blagojevich, Handley, and Thomas are represented by the same counsel and bring a joint motion to dismiss, the Court will refer to these three Defendants as the "State Officials."

2. More specifically, the Adjutant General is "the head of the Department of Military Affairs of the Executive Branch of the government of the State," 20 ILCS 1805/22(d)—a department created to serve as "the channel of communication between the Federal Gov-

ernment and the State of Illinois on all matters pertaining to the State military forces." 20 ILCS 1805/20. The Adjutant General is "the immediate adviser of the Commander-in-Chief on all matters relating to the militia and [is] charged with the planning, development and execution of the program of the military forces of the State. He [is] responsible for the preparation and execution of plans, for organizing, supplying, equipping and mobilizing the Organized Militia, for use in the national defense, and for State defense, and emergencies." 20 ILCS 1805/22(a).

lenge Academy ("LCA"), a quasi-military institution operated as part of the Illinois National Guard. (*Id.* at ¶¶ 16, 22.) The IDMA—an executive branch department within the control of Thomas, as the Adjutant General—has statutory authority to conduct and administer the affairs of LCA. (*Id.* at ¶¶ 18–19.) LCA receives approximately sixty percent of its funding from the federal government.[3] (*Id.* at ¶ 17.)

The IDMA renewed Plaintiff Steigmann's employment contract on July 1, 2000. (*Id.* at ¶ 24; *see also id.* at ¶ 21 (alleging that, through Sheedy, Thomas is responsible for the "execution and administration of contracts of employment with teachers and support staff" employed by LCA).) The 2000 contract, which covered the period from July 1, 2000 through June 30, 2002, created Steigmann's Community Relations position at LCA. (*Id.* at ¶¶ 25, 26.) The IDMA renewed Steigmann's 2000 contract on July 1, 2002 to last through June 30, 2004. (*Id.* at ¶¶ 32, 33.) Steigmann alleges that the IDMA had a "longstanding policy and practice to automatically renew contracts of LCA employees," except when the employee had job performance problems. (*Id.* at ¶ 23.)

Steigmann alleges that his Community Relations position at LCA, as specified in his 2000 and 2002 employment contracts, was a "non-policymaking and non-confidential position," since it required him to perform all of his duties "in accordance with LCA policies and goals." (*Id.* at ¶¶ 27, 28, 35, 36.) Steigmann did not append the current job description (which was incorporated by reference into the 2002 contract) to his complaint, but Defendants attached it to their motion to dismiss. (R. 46–1, State Officials' Mot. to Dismiss, Ex. B.) That job description identifies the following duties for the Community Relations position:

> Under the general supervision of the Director, plans, implements, and supervises programs designed to advance the objectives of the Department and the Lincoln's Challenge Academy and programs that assist cadets.
>
> 1. In accordance with LCA policies and goals, develops projects to maintain and advance departmental, programmatic, and governmental community relations. Assembles data and prepares reports regarding cadets and the State and Fed-

3. LCA was created pursuant to 32 U.S.C. § 509, which authorizes the United States Secretary of Defense to "use the National Guard to conduct a civilian youth opportunities program ... which shall consist of at least a 22–week residential program and a 12–month post-residential mentoring period." "The Program shall seek to improve life skills and employment potential of participants by providing military-based training and supervised work experience, together with the core program components of assisting participants to receive a high school diploma or its equivalent, leadership development, promoting fellowship and community service, developing life coping skills and job skills, and improving physical fitness and health and hygiene." *Id.* "To carry out the Program in a State, the Secretary of Defense shall enter into an agreement with the Governor of the State ... under which the Governor ... will establish,

organize, and administer the Program in the State." 32 U.S.C. § 509(c). Since 2001, federal assistance for maintaining civilian youth opportunities programs has been capped at 60 percent of total program expenditures. 32 U.S.C. § 509(d)(4); *see also* 20 ILCS 1085/56–1 (indicating that at least some of LCA's federal funding comes from the "Federal Support Agreement Revolving Fund" that is governed by the Federal Support Agreement between the IDMA and the United States Property and Fiscal Officer for Illinois). Within 90 days after the end of each fiscal year, the Secretary of Defense has to submit to Congress a report on the design, conduct, and effectiveness of the Program during the preceding fiscal year. 32 U.S.C. § 509(k). In preparing the report, the Secretary is required to coordinate with the Governor of each State in which the Program is carried out. *Id.*

eral legislative districts from which they originate.

2. Serves as the Academy Grant Writer. Submits official proposals to agencies for solicitation of grants is the point of contact regarding donations and contributions in order to receive matching federal funds. Develops problem solving techniques and researches methods of acquisition in regards to grants, donations, and contributions. Assists as needed in recruitment of mentors from the communities.

3. Works directly with members of the public, civic organizations, and specific community groups on joint projects that serve to enhance the image of the program and advance its objectives. Plans, coordinates, and executes special events that serve to advance community relations; including motivational and keynote speakers, tours of the Academy, press releases and coverage, State Advisory Council Meetings, cadet ceremonies, etc.

4. Provides creative support for departmental and program publications based on guidance from the National Guard Bureau. Coordinates with state headquarters, directorates, brigades, and air bases on joint military projects that enhance staff and community relations.

5. Performs other duties as required or assigned which are reasonably within the scope of duties enumerated above. (*Id.*, Ex. B.) The State Officials also attached the job description incorporated into the 2000 contract; that description varies somewhat from the current one. (R. 35–1, Am. Compl. at ¶¶ 34, 35.) [4]

## III. The Alleged Patronage Dismissal

Governor Blagojevich, the candidate for the Democratic Party, was elected governor of Illinois on November 5, 2002. (R. 35–1, Am. Compl. at ¶ 41.) George Ryan, a member of the Republican Party, previously held the position of governor in Illinois. (*Id.* at ¶ 42.) Once elected, Governor Blagojevich instituted Executive Order 1, which stated, "no ... department ... subject to the control or direction of the Governor shall take any ... action which will result in the increase or maintenance of present levels in State employment or compensation ... payable in connection with State employment, including personal service contracts." (*Id.* at ¶ 46.) Steigmann alleges that this Executive Order was instituted pursuant to Governor Blagojevich's "policy to retaliate against and dismiss any employee prominently associated with the Republican Party." (*Id.* at ¶ 45.)

In order to further this objective, Steigmann alleges that Governor Blagojevich

4. Specifically, the 2000 job description identified the following responsibilities: "(1) In accordance with LCP policies and goals, develops projects to maintain and advance departmental programmatic, and governmental and community relations. Assembles data and prepares reports regarding cadets and the State and Federal legislative districts from which they originate. (2) Coordinates and oversees ongoing community relations projects and develops appropriate problem-solving actions. Assists as needed in recruitment of mentors from the communities. (3) Plans and executes special events that serve to advance departmental, program, and community relations. (4) Provides creative support for departmental and program publications and all publications that advance the objectives of Lincoln's Challenge. (5) Coordinates with state headquarters, directorates, brigades, and air bases on projects that enhance staff and community relations. (6) Works directly with members of the public, civic, and specific community groups on projects that enhance the image of the program and advance its objectives. (7) Performs other duties as required or assigned which are reasonably within the scope of duties enumerated above." (R. 46–1, State Officials' Mot. to Dismiss, Ex. A.)

designated Handley as deputy Chief of Staff to coordinate patronage employment decisions for the Democratic Party. (*Id.* at ¶ 48.) Steigmann claims that Governor Blagojevich, the Democratic Party, Handley, and Thomas targeted for removal employees prominently associated with the Republican Party and specifically Steigmann "for his associational activities and blood relation to Justice Robert J. Steigmann." (*Id.* at ¶ 52.) Steigmann also alleges that Governor Blagojevich, through Handley, delegated the "hiring and firing authority" with respect to Steigmann's position to the Democratic Party. (*Id.* at ¶ 55.) In particular, Steigmann alleges that Governor Blagojevich, Handley, and the Democratic Party: (1) entered an agreement to use the hiring and firing process at LCA to directly harm and harass Steigmann for his personal and political associations (*id.* at ¶ 56); (2) departed from LCA's longstanding policy, by soliciting applicants for LCA positions, even if those positions already were occupied (*id.* at ¶ 57); (3) solicited only those applicants who were members or actively involved in the affairs of the Democratic Party (*id* at ¶¶ 58–60); and (4) did not permit then-current LCA employees to apply for a promotion (*id.* at ¶ 61).

On or about June 30, 2004, Steigmann claims that Thomas directed Sheedy not to renew Steigmann's employment contract. (*Id.* at ¶ 63.) As a result, Steigmann was terminated as LCA's Community Relations Specialist on June 30, 2004. (*Id.* at ¶ 62.) Plaintiff did not receive any explanation for the decision not to renew his contract. (*Id.* at ¶ 64.) On July 1, 2004, the Defendants replaced Steigmann with Charles "Chub" Connor, a former elected official affiliated with the Democratic Party and a prominent and active member of that organization. (*Id.* at ¶¶ 65–66.)

Steigmann contends that his termination is actionable under 42 U.S.C. § 1983 because it violated the First and Fourteenth Amendments to the United States Constitution.

## ANALYSIS

### I. Legal Standard

Defendants premise their motions to dismiss on Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion tests the sufficiency of a complaint. It is not designed to resolve the case on the merits. *Johnson v. Rivera,* 272 F.3d 519, 520–21 (7th Cir.2001). When determining whether to grant a 12(b)(6) motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor, *Jang v. A.M. Miller & Assocs.,* 122 F.3d 480, 483 (7th Cir.1997), but a court is not obliged to accept the complaint's legal conclusions as true. *Hickey v. O'Bannon,* 287 F.3d 656, 658 (7th Cir.2002); *Brandt ex rel. Brandt v. Bd. of Educ. of City of Chicago,* 326 F.Supp.2d 916, 920 (N.D.Ill. 2004). In addition, on a motion to dismiss, a court may consider judicially noticed documents such as historical documents, documents contained in the public record, and reports of administrative bodies. *See Menominee Indian Tribe of Wisconsin v. Thompson,* 161 F.3d 449, 456 (7th Cir. 1998). A court should dismiss a complaint under Rule 12(b)(6) only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Centers v. Centennial Mortgage, Inc.,* 398 F.3d 930, 933 (7th Cir.2005) (courts should grant a motion to dismiss only "if it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").

## II. The State Officials' Motion To Dismiss

The State Officials contend that Steigmann cannot establish that Defendants violated his First Amendment rights. Specifically, the State Officials assert that Steigmann's Community Relations position entailed significant policymaking duties such that the alleged patronage dismissal would not violate the First Amendment. In the alternative, the State Officials assert a defense of qualified immunity.

### A. Section 1983

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that he or she was (1) deprived of a federal right, privilege, or immunity (2) by any person acting under color of state law." *See Racine Charter One, Inc. v. Racine Unified School Dist.,* 424 F.3d 677, 680 (7th Cir. 2005) (citing *Gomez v. Toledo,* 446 U.S. 635, 638, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)). Here, Plaintiff asserts that the State Officials violated his First Amendment Rights by discharging him based on his political affiliation.

■ "The First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved." *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 64–65, 110 S.Ct. 2729, 2732, 111 L.Ed.2d 52, 60 (1990). The prohibition on conditioning employment on political belief extends to "promotion, transfer, recall, and hiring decisions," as well. *Id.; Carlson v. Gorecki,* 374 F.3d 461, 464 (7th Cir.2004) (as a "general proposition [ ] public employees may not be made to suffer adverse job actions because of their political beliefs"). The First Amendment prohibits discharge based on political affiliations because of the "coer-

cion of belief that necessarily flows from the knowledge that one must have a sponsor in the dominant party in order to retain one's job." *Branti v. Finkel,* 445 U.S. 507, 516, 100 S.Ct. 1287, 63 L.Ed.2d 574, 582–83 (1980). Put another way, "[t]he freedom to associate with persons of like mind and opinion, and believe in a particular cause or idea are among the core rights protected by the First Amendment. Government cannot condition employment on belief or adherence to a particular idea or political party any more than it can condition a benefit on the same." *Thompson,* 300 F.3d at 755; *Elrod v. Burns,* 427 U.S. 347, 357, 96 S.Ct. 2673, 2682, 49 L.Ed.2d 547, 556 (1976) ("Patronage, [ ] to the extent it compels or restrains belief and association is inimical to the process which undergirds our system of government and is at war with the deeper traditions of democracy embodied in the First Amendment" (internal quotation omitted)).

■ Yet "the First Amendment does not categorically limit the ability of elected leaders from surrounding themselves with loyal, like-minded subordinates. If a public employer can demonstrate a compelling reason for a dismissal based on political affiliation, then the removal may be constitutionally justified." *Thompson,* 300 F.3d at 755. Stated differently, "in the name of freedom of speech [ ] a public official cannot be fired on the basis of his political affiliation unless the nature of his job makes political loyalty a valid qualification; this could be either because the job involves the making of policy and thus the exercise of political judgment or the provision of political advice to the elected superior, or because it is a job (such as speechwriting) that gives the holder access to his political superiors' confidential, politically sensitive thoughts." *Riley v. Blagojevich,* 425 F.3d 357, 359 (7th Cir.2005)

(citing *Elrod,* 427 U.S. at 367–68, 96 S.Ct. 2673 and *Branti,* 445 U.S. at 518, 100 S.Ct. 1287); *see also Flenner v. Sheahan,* 107 F.3d 459, 463 (7th Cir.1997) (party affiliation is not an appropriate requirement for an individual "who performs primarily ministerial functions and who has little autonomy or discretion in performing his duties").

In determining whether political affiliation is an appropriate requirement, a court's "focus is on the 'inherent powers' of the office, not what any individual officeholder actually does." *Thompson,* 300 F.3d at 756; *Riley,* 425 F.3d at 361 ("[t]he idea that job performance (rather than job description) should control *Elrod–Branti* analysis has been consistently rejected by this court and others") (quoting *Gordon v. County of Rockland,* 110 F.3d 886, 888 (2d Cir.1997) (parentheses in original)). Ultimately, "[t]he test for whether a position involves policymaking is 'whether the position authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation.'" *Kiddy–Brown v. Blagojevich,* 408 F.3d 346 (7th Cir.2005) (citing *Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir.1981)). "Therefore, even 'if an officeholder performs fewer or less important functions than usually attend his position, he may still be exempt from the prohibition against political terminations if his position inherently encompasses tasks that render his political affiliation an appropriate prerequisite for effective performance.'" *Id.; see also Riley,* 425 F.3d at 361 ("Otherwise the courts—and the elected officials—would have 'the burden of having to re-examine a certain position

every time a new administration changes the mix of responsibilities bestowed upon the officeholder.'") (quoting *Tomczak v. City of Chicago,* 765 F.2d 633, 641 (7th Cir.1985)).

### B. Qualified Immunity

"Qualified immunity shields government officials who are performing discretionary functions from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Milazzo v. O'Connell,* 108 F.3d 129, 131 (7th Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The doctrine of qualified immunity "spare[s] a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Wilson v. Formigoni,* 42 F.3d 1060, 1064 (7th Cir.1994) (quoting *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991)). Accordingly, "[t]he issue of qualified immunity is to be resolved at the earliest stages of litigation." *Kiddy–Brown,* 408 F.3d at 352. After all, "[p]ublic officials need not predict, at their financial peril, how constitutional uncertainties will be resolved." *Riley,* 425 F.3d at 360 (citing *Hosty v. Carter,* 412 F.3d 731, 739 (7th Cir.2005) (*en banc*)).

"[I]n order for a plaintiff to successfully defeat a qualified immunity defense, two conditions must be satisfied: (1) the complaint must adequately allege facts that, if true, would constitute a violation of a constitutional right;[5] (2) the case law must be 'clearly established' at the time of the alleged violation, so that a reasonable public

---

5. The analysis for determining whether Plaintiff has pleaded a constitutional violation sufficient to sustain his Section 1983 claim is essentially identical to the first prong of the qualified immunity analysis. *See Flint ex rel.*

*Flint v. Kentucky Dept. of Corrections,* 270 F.3d 340, 348–49 (6th Cir.2001); *Smith v. Citrus County, Fla.,* No. 5:04CV684–OC–10GRJ, 2005 WL 1065545, *3 (M.D.Fla.2005).

official would have know that his conduct was unlawful." *Delgado v. Jones,* 282 F.3d 511, 516 (7th Cir.2002); *Jones v. Wilhelm,* 425 F.3d 455, 461 (7th Cir.2005) (same); *see also Wilson,* 42 F.3d at 1065 (7th Cir. 1994) (determining whether plaintiff states a cognizable violation of a constitutional right "permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits" (quoting *Siegert,* 500 U.S. at 232, 111 S.Ct. at 1793)). "If the law at the time was not clearly established, a government official could not be reasonably expected to anticipate legal developments, nor could the official fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

"To prove the presence of a clearly established constitutional right, the plaintiff must point to closely analogous cases decided prior to the defendants' challenged actions." *Kiddy–Brown,* 408 F.3d at 353 (quoting *Upton v. Thompson,* 930 F.2d 1209, 1212 (7th Cir.1991)). Yet "[t]he law of qualified immunity does not require a plaintiff to produce a case that is 'directly on point' in order to show that a right is clearly established." *Id.* at 356 (quoting *Nabozny v. Podlesny,* 92 F.3d 446, 456 (7th Cir.1996)). Rather, "[t]he question is whether a reasonable state actor would have known that his actions, viewed in the light of the law at the time, were unlawful." *Id.* (quoting *Nabozny,* 92 F.3d at 456). Plaintiff bears the burden of proving that a right was clearly established at the time of the conduct at issue. *Id.* (citing *Davis v. Scherer,* 468 U.S. 183, 197, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).

## C. Recent Opinions from the Seventh Circuit

■ Two recent opinions from the Seventh Circuit involve similar allegations to those here and thus guide the Court's analysis of Plaintiff's Section 1983 and the State Officials' affirmative defense of qualified immunity. The Court will discuss each in turn.

### a. *Kiddy–Brown v. Blagojevich*

In *Kiddy–Brown,* the Seventh Circuit upheld a denial of qualified immunity (on a motion for judgment on the pleadings) where the plaintiff, a state prison warden, alleged that she had been terminated on the basis of political affiliation. Kiddy–Brown alleged that her "duties and responsibilities as Warden were of limited scope." *Kiddy–Brown,* 408 F.3d at 355. Kiddy–Brown further alleged: (1) that she "had no autonomous or discretionary authority," (2) that she "did not participate in determining policy which fixed objectives," (3) that she "did not act authoritatively on any policy-making issue impacting the State or IDOC," (4) that her "responsibilities were tightly constrained by statutes, regulations and rules," and (5) that the State officials knew of her "political affiliation with the Republican administration and her lack of Democratic political sponsorship" and were motivated to terminate her employment because she was not "a political ally of the Democratic administration." *Id.*

Taking these allegations together, the Seventh Circuit concluded that Kiddy–Brown had alleged facts that, if true, would demonstrate the violation of a constitutional right:

> [A]t this very early stage of the litigation, the State defendants have not shown that the warden position at DCC is exempt from the general prohibition on political patronage dismissals. We simply are not presented with evidence sufficient to allow us to conclude that

the warden position involved the kind of policymaking duties that would make political affiliation an appropriate requirement for the position.

*Kiddy–Brown,* 408 F.3d at 356. Although the State officials had attached the position description for warden to their motion to dismiss, it appears that the Seventh Circuit did not consider that document in rendering its decision. *See Riley,* 425 F.3d at 364. The court concluded that Kiddy–Brown's complaint contained allegations sufficient to establish that defendants violated her First Amendment rights and that those rights were "clearly established" so as to sink defendants' claim of qualified immunity. *Kiddy–Brown,* 408 F.3d at 356–57.

### b. *Riley v. Blagojevich*

In *Riley,* the Seventh Circuit considered the denial of qualified immunity raised in a motion to dismiss under Rule 12(b)(6).[6] *Riley,* 425 F.3d at 359. In the underlying case, Riley, an assistant warden of an Illinois state prison, alleged that he had been fired by Governor Blagojevich because of political affiliation. *Id.* Like Kiddy–Brown, Riley contended that he was not a policymaking official or confidential employee, but did not attach the official job description to his complaint. *Riley v. Blagojevich,* 2004 WL 1745748 at *1 (N.D.Ill. 2004). Defendants, however, attached the official job description to their motion to dismiss and Riley stipulated to its veracity. *Riley,* 425 F.3d at 364. The Seventh Circuit reversed the district court's denial of

defendants' motion to dismiss. *Id.* at 365. The *Riley* court explained the different outcomes thus: in *Riley* the court looked to the contents of the job description which reflected sufficient policymaking duties, *id.* at 361–64, while, in contrast, "the court in *Kiddy–Brown,* the court treated the job description appended to the defendants' answer as a document barren of evidentiary significance, since no effort had been made to establish its authenticity, let alone its reliability." *Id.* at 364.

The *Riley* court explained further:

It seems to us that if no basis is presented for thinking the official job descriptions systemically unreliable in a sense to be explained, the elected officials can rely on them, even if a plaintiff is prepared to testify (self-servingly) that the job description doesn't actually describe what he does, thus precipitating a factual inquiry likely to be protracted and inconclusive.

\* \* \* \* \* \*

[But] [f]or the job description to be the pivot on which the case turns, inquiry must focus on how the description was created; how it is updated and thus kept realistic rather than being allowed to drift far from the actual duties of the position; in short, on how reliable, how authoritative, the description is.[7]

\* \* \* \* \* \*

[T]he job description, if reliable, is the correct basis for the court's determining

---

**6.** *Riley* also involved a consolidated appeal of, Thomas Snyder, another assistant warden. In that case, Snyder was appealing the district judge's grant of summary judgment for defendants on their claim of qualified immunity. *Riley,* 425 F.3d at 359.

**7.** The Seventh Circuit concluded that the job descriptions at issue "score well on this test" because "each of the two descriptions is a

reliable description rather than something that has been manipulated by officials seeking to expand their power to appoint loyalists beyond the lawful bounds." *Riley,* 425 F.3d at 361. Furthermore, both Riley and Snyder essentially stipulated to the accuracy and authenticity of the job descriptions defendants presented to the court. *Id.* at 361.

whether political affiliation is a legitimate requirement of the job ...

*Id.* at 360–61, 364. Yet the *Riley* court emphasized that the job description, though pivotal, may not be dispositive in all cases:

Neither [*Riley* nor any other case] stand[s] for the proposition that every *Elrod/Branti* case can be resolved just by reading the job description. The description might leave the reader unclear whether the job confers any policymaking or confidential discretion, and then additional evidence would be necessary. Some job descriptions, perhaps, will have been altered by the elected officials not to reflect actual changes in the duties of a position but rather to enable them to fill jobs that do not involve such duties with their political favorites.

*Id.* at 365. Rather, "[t]he significance of the official job description in a case like this is thus as a provisional safe harbor for elected officials. If the official job description is objective, as shown by the methods by which it is created, vetted, and updated to the present, then the elected officials can rely on it in deciding whom they can replace on political grounds." *Id.*

### D. Rule 12(b)

■ In large part, the State Officials' Motion relies on the official position description attached to, and incorporated by reference, in Steigmann's 2000 and 2002 employment contracts. The State Officials attached the employment contracts and the position descriptions to their motion—Plaintiff did not attach these items to the Complaint—and assert that the Court should consider these documents as part of the pleadings because the contracts are referred to in the Complaint and are "central" to Steigmann's claims.

Plaintiff—who does not challenge the authenticity or accuracy of the employ-ment contract or the incorporated job description (*see, e.g.,* R. 75–1, Pl.'s Sur–Reply to State Officials' Motion at 2, 4–8)—contends that "the terms of the [employment] contract are not at issue and, therefore, should not be considered by the court." (R. 53–1, Pl.'s Resp. to the State Officials Motion to Dismiss at 9.) Plaintiff contends rather that his claim centers on "Defendant State Officials conduct surrounding the policies and procedures implemented to extinguish employees politically affiliated with the Republican Party." (*Id.*) In the alternative, Plaintiff contends that the Court cannot consider the employment contracts without converting the State Officials' 12(b)(6) motion into a motion for summary judgment under Rule 56. (*Id.*)

Because Plaintiff did not attach the job description to the Complaint the Court must, as a threshold matter, determine whether it can consider these documents in analyzing the State Officials' Rule 12(b)(6) motion to dismiss. Federal Rule of Procedure 12(b) limits the scope of materials that a court can consider in resolving a motion under Rule 12(b)(6):

If, on a motion asserting the ... failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56.

"Rule 12(b) is mandatory; consequently, if documents outside of the pleadings are placed before a district court, and not excluded, the court must convert the defendant's 12(b)(6) motion to one for summary judgment and afford the plaintiff an opportunity to submit additional evidentiary material of his or her own." *Venture Assoc. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993); *Wright v. Associ-*

*ated Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir.1994) (same).

"On the other hand, Federal Rule of Civil Procedure 10(c), which provides that '[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes,' is permissive in nature. A plaintiff is under no obligation to attach to her complaint documents upon which her action is based, but a defendant may introduce certain pertinent documents if the plaintiff failed to do so." *Venture Assoc.*, 987 F.2d at 431; *see also Knafel v. Chicago Sun–Times, Inc.*, 413 F.3d 637 (7th Cir.2005). Accordingly, a court may look to "[d]ocuments that a defendant attaches to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to the claim." *Venture Assoc.*, 987 F.2d at 431; *Continental Cas. Co. v. American Nat'l Ins. Co.*, 417 F.3d 727, 731 (7th Cir.2005). This "exception to Rule 12(b) . . . has been thought to follow from Rule 10(c); the concern is that, were it not for the exception, the plaintiff could evade dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that proved that his claim had no merit." *Tierney v. Vahle*, 304 F.3d 734, 738–39 (7th Cir.2002) (further noting that "the scope of [this] exception [to Rule 12(b) ] . . . is uncertain" but stating that "[w]hat would not be cricket would be for the defendant to submit a document in support of his Rule 12(b)(6) motion that required discovery to authenticate or disambiguate; in such a case the judge would be required to convert the defendant's motion to a Rule 56 motion if he were minded to consider the document in deciding whether to grant the motion"). The Seventh Circuit has considered documents central to a plaintiff's claim if the plaintiff repeatedly quotes from the documents. *See Wright*, 29 F.3d at 1248.

The employment contracts and the incorporated job descriptions are central to Plaintiff's claim and referred to in Plaintiff's Complaint. All told, Plaintiff refers to these contracts at least sixteen times in his complaint. (R. 35–1, Am. Compl. at ¶¶ 24–39). Plaintiff also makes allegations regarding the content of his employment contracts. For instance, he alleges that the 2000 contract established his position at LCA and that under that contract: (1) he never possessed the authority to speak in the name of policymakers for LCA or IDMA, (2) that he was never privy to confidential communications between the policymakers for LCA or IDMA, (3) that political fidelity was not a bona-fide criterion for selection to and/or performance of the duties of Community Relations Specialist for LCA, and (4) that he had to perform all of his duties "[i]n accordance with LCA policies and goals" (a direct quote from the job description referred to in the 2000 contract). (*Id.* at ¶¶ 28–31.) Plaintiff makes similar allegations as to the 2002 contract, as well. (*Id.* at ¶¶ 36–39.)

In addition, the employment contracts and incorporated job descriptions go to the heart of Plaintiff's claim. Under established Seventh Circuit precedent, the Court must look to the duties "inherent" to the Community Relations position in order to assess whether political affiliation is an "appropriate requirement," and *Riley* makes clear that the job description should be "the pivot" upon which a case like this turns. Plaintiff cannot get a free pass to get beyond a motion to dismiss by simply failing to attach documents (that he effectively concedes are accurate) to the Complaint where the Complaint refers to those documents and those documents are central to his claim. *Venture Assoc.*, 987 F.2d at 431.

### E. Plaintiff's Job Description Demonstrates that He Cannot State a Claim

■ Having determined that the current job description is central to Plaintiff's claim (and thus appropriate to consider on a motion to dismiss), the Court turns to the issue of whether policymaking inheres in Plaintiff's job description. In this regard, the Court can glean some guidance from *Riley*. There, the Seventh Circuit analyzed two job descriptions and found that certain functions in the job "descriptions enumerate[d] ... tasks that are judgmental, policy-oriented, and politically sensitive," such as the following:

- Assists in the development, establishment and implementation of rules, regulations, directives, policies and procedures of the institution to ensure proper operation of the daily functions; administratively responsible and accountable for execution of policies and procedures in management of the institution while serving as Duty Warden.

- Assists the Warden in carrying out policies, rules and regulations of the institution ensuring orderly operation of daily functions of the institution, administratively responsible and accountable for execution of policies and procedures and management of the institution while serving as Duty Warden.

- Plans, organizes and assumes direct responsibility over functions of academic and vocational, chaplaincy, clinical services, leisure time activities, medical and dental services; coordinates all residents programs relating to these functions. Monitors Pre–Start Program and Lifestyle Redirection Program.

- Plans, organizes and directs the overall Operations function and their managers, including security, physical plant operations, dietary services, inmate discipline, work camp and other miscellaneous logistical support services; coordinate[s] all inmate programs related to these functions; participates in the budget process by gathering data from department heads regarding current and anticipated programs and projects; makes recommendations to management outlining budgetary needs.

- Serves as Chairman of the Adjustment Committee; makes decisions on disciplinary problems involving infractions of the institution rules by residents; hears and resolves problems; enforces discipline.[8]

*Riley*, 425 F.3d at 362.

The Court can glean further guidance from *Thompson*. There, the Seventh Cir-

---

**8.** The Seventh Circuit further determined that the following items did not involve policymaking duties:

Supervises staff; assigns work; approves time off; provides guidance and training; gives oral reprimands and effectively recommends grievance resolutions; completes and signs performance evaluations; establishes annual goals and objectives; counsels employees on problems with productivity and quality of work; determines staffing needs to achieve program goals and objectives; reviews activity reports.

Serves as Chairman of the Safety and Sanitation Committee; conducts routine and unscheduled safety, health, sanitation and security inspection tours throughout the institution; makes recommendations to the Warden as to any changes, problems or improvements.

Speaks to lay and professional groups regarding various institutional programs; answers correspondence from the general public.

Conducts daily routine inspection tours of the institution including the inspection of

cuit concluded that, based on the description alone (which described the duties of the Chief Administrative Law Judge for the Illinois Department of Professional Regulation), it was apparent that plaintiff was a policymaking official where his job duties included: "directing subordinate staff, formulating procedures for the hearing programs, advising peer review committees, developing hearing program goals, and directing and implementing the program budget." *Thompson*, 300 F.3d at 757 (further noting that "while any one of these activities alone might not be considered policymaking, together they indicate that [plaintiff] spends a considerable amount of time formulating policy and implementing broad goals").[9]

Based on these authorities, the Court concludes that Plaintiff's job description reflects a significant level of "judgmental, policy-oriented, and politically sensitive" duties such that the State Officials could not have violated the First Amendment.[10] On its face, Plaintiff's job description demonstrates that his position involved inherent policymaking authority. Among other things, Plaintiff was vested with the authority to: (1) develop projects, in line

---

resident's living quarters; instructs and counsels residents by holding regular interviews by request in order to assist them with problems and confers with resident's relatives.

9. The Seventh Circuit has found that other job descriptions reflect policymaking duties sufficient to grant a motion to dismiss. *See, e.g., Pleva v. Norquist*, 195 F.3d 905, 912–13 (7th Cir.1999) (affirming grant of motion to dismiss where plaintiff was a member of the city board of zoning appeals who had the duty to determine: (1) whether a variance "is necessary for the preservation and enjoyment of property rights," and whether a variance will "be contrary to the spirit, purpose and intent of [the zoning regulations], or the public interest," and (2) whether a special use "is necessary for the public convenience," and whether "public health, safety and welfare is protected"); *Americanos v. Carter*, 74 F.3d 138, 141 (7th Cir.1996) (finding no First Amendment violation at motion to dismiss stage where plaintiff's position, deputy attorney general, entailed "perform[ing] in behalf of ... the state any and all of the rights, powers or duties now or hereafter conferred by law or laws upon the attorney general" and "prosecuting and defending suits by or against the state and state officers, defending suits against state governmental officials or employees or teachers, advising state officials through opinions, advising state agencies, [and] collecting outstanding debts owed to the state").

10. In his sur-reply to the State Officials' motion to dismiss, Steigmann contends that dismissal is not warranted because *Riley* emphasized that "to be the pivot on which the case turns, inquiry must focus on how the description was created; how it is updated and thus kept realistic rather than being allowed to drift far from the actual duties of the position; in short, on how reliable, how authoritative, the description is." *Riley*, 425 F.3d at 361. The Court, however, disagrees. *Riley* makes clear that the point of inquiring into reliability is to determine whether the job description is "a reliable description rather than something that has been manipulated by officials seeking to expand their power to appoint loyalists beyond the lawful bounds." *Id.* at 361. Here, the record shows that Plaintiff's current job description dates back to 2002, when he renewed his employment contract. (R. 46–1, State Officials' Mot. to Dismiss, Ex. B.) At that time, the current Democratic administration was not yet in power, and, thus, the State Officials could not have manipulated the description to appoint loyalists. Moreover, Plaintiff effectively concedes that he executed the employment contract that contained the job description described above. (*See also* R. 35–1, Am. Compl. at ¶ 34 (alleging that Plaintiff's 2002 contract "clarified" the Community Relations Specialist position).) Because the concerns cited in *Riley* are not present here the Court concludes that the appended job description is reliable. Furthermore, with no more information than that available here, the Seventh Circuit concluded that Riley's job description was sufficiently reliable to warrant dismissal. *Riley*, 425 F.3d at 361 (noting that only the current description was in the record before the court).

with LCA's policies and goals, to maintain and advance departmental, programmatic, and governmental community relations; (2) write grant proposals and to develop problem solving techniques for acquiring grants, donations, and contributions, (3) plan, coordinate, and execute special events that advance community relations, including motivational and keynote speakers, and press releases and coverage; and (4) to provide creative support for departmental and program publications based on guidance from the National Guard Bureau. Inherent in this job description is at least as much policy-oriented and politically-sensitive duties as the job descriptions in both *Riley* and *Thompson.* If assisting a warden with developing policies to ensure proper operations of a prison's daily functions (as in *Riley*) is a judgmental, policy-oriented, or politically sensitive duty, then so, too, was Plaintiff's duty of developing projects to advance "governmental community relations." Similarly, Plaintiff's position demanded that he solicit funds, issue press releases, and providing creative support on behalf a government-sponsored academy—activities which, taken in the aggregate, reflect significant policy-making and politically sensitive activity.[11] *See, e.g., Thompson,* 300 F.3d at 757. Accord-

ingly, the Court dismisses Plaintiff's Complaint for failure to state a claim upon which relief can be granted.

## F. Even If Plaintiff Could Demonstrate a Deprivation of Constitutional Rights, the State Officials Nonetheless Would Be Entitled to Qualified Immunity

■ Assuming for the sake of argument that Plaintiff's position did not entail policymaking, the State Officials would be entitled to qualified immunity because Plaintiff cannot demonstrate that the State Officials violated a "clearly established" constitutional right. Plaintiff bears the burden of establishing, through "closely analogous" cases, that the constitutional right at issue is clearly established. *See Kiddy–Brown,* 408 F.3d at 353. Here, Plaintiff fails to offer any cases suggesting that a public employee with duties *like those inherent in the Community Relations position* has a right to be protected from patronage dismissals. *See id.,* 408 F.3d at 356 ("The question is whether a reasonable state actor would have known that his actions, viewed in the light of the law at the time, were unlawful"). Indeed, the only case

11. Plaintiff argues that the Court must deny the State Officials' motion to dismiss because "[n]owhere in [their] assertions was it specified exactly what the [LCA's] goals and policies are, or that they are specifically political, such that political affiliation would interfere with the discharge of Plaintiff's public duties." (R. 53–1, Pl.s' Resp. to the State Officials' Mot. to Dismiss at 6.) As its statutory grant of authority makes clear, however, LCA must institute goals and policies (in line with which Plaintiff had to develop community relations projects) that "improve life skills and employment potential," further "leadership development," "promot[e] fellowship and community service," and "develop[] life coping skills and job skills." 32 U.S.C. § 509; *see also* National Guard Youth Challen*NG*e Program 2004 Performance and Accountabili-

ty Highlights 5, 45 (2d Ed.2005) (the Congressionally-mandated annual report describing the National Guard's Challe*NG*e Program—a program "administered by the National Guard Bureau on behalf of the Department of Defense"—and noting LCA's achievements during the reporting year; the report is available through the United States Department of Defense website at http://www.defenselink.mil/ ra/documents/2004AnnualReportFinalversion4–27–05.pdf). Deciding what activities meet these criteria involves politically-sensitive and policy-oriented determinations. In addition, the Court properly may take judicial notice that LCA has been created to a specific statutory directive without transforming the State Officials' motion to dismiss into a motion for summary judgment. *See Menominee Indian Tribe,* 161 F.3d at 456.

Plaintiff offers on this point is *Kiddy–Brown.* (R. 53–1, Pl.'s Resp. to the State Officials' Mot. to Dismiss at 12–13.) That case, however, dealt only with the unsupported allegations put forth in Kiddy–Brown's complaint. *See Riley,* 425 F.3d at 364. Even though Plaintiff's allegations are similar to Kiddy–Brown's, those allegations are belied by the actual job description at issue here—a job description that the Court may properly consider given that it is central to Plaintiff's claim and repeatedly referred to in the Complaint. *Venture Assoc.,* 987 F.2d at 431. Thus, Plaintiff has not met this burden of providing "closely analogous" cases and, even if Plaintiff could establish a cognizable constitutional violation, his claim would be barred by qualified immunity.

### III. The Democratic Party's Motion to Dismiss

■ For the reasons stated above, the Court grants the Democratic Party's motion to dismiss because Plaintiff has failed to demonstrated that his dismissal violated his First Amendment rights. The Court could grant the Democratic Party's motion on another ground, as well. The Democratic Party argues that the Complaint makes vague conspiracy allegations and the Democratic Party did not have or exercise any hiring or firing authority that Steigmann alleges the Party had.

"While a private citizen cannot ordinarily be held liable under Section 1983 because that statute requires action under color of state law, if a private citizen conspires with a state actor, then the private citizen is subject to Section 1983 liability." *Brokaw v. Mercer County,* 235 F.3d 1000, 1016 (7th Cir.2000) (citing *Bowman v. City of Franklin,* 980 F.2d 1104, 1107 (7th Cir. 1992)); *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966) (private parties jointly engaged with state officials in prohibited actions are acting under color of law). "For an individual to act under color of law, there must be evidence of a *concerted effort* between a state actor and that individual." *Fries v. Helsper,* 146 F.3d 452, 457 (7th Cir.1998) (emphasis original). *Id.* Accordingly, a plaintiff must do more than allege that the private party simply made a recommendation to state officials that certain individuals be hired. *Vickery v. Jones,* 100 F.3d 1334, 1344–45· (7th Cir.1996). Rather, a plaintiff must allege that a private party acted under color of state law by working in concert with the state officials to deprive them of their constitutional rights, *id.* at 1345 (quoting *Tarpley v. Jeffers,* 96 F.3d 921, 928 n. 3 (7th Cir.1996)), and that the private party was responsible for the hiring (or firing) of the public employee. *Id.*

In this case, Steigmann alleges that the Democratic Party contributed to the State Officials' and Governor Blagojevich's scheme to dismiss Steigmann for his party affiliation. (R. 35–1, Am. Compl. at ¶¶ 48, 52, 54–56.) Specifically, Steigmann alleges that Governor Blagojevich, through Handley, delegated hiring and firing authority with respect to Plaintiff's position to the Democratic Party. (*Id.* at ¶ 55.) Although he alleges that the Democratic Party had "hiring and firing authority," Steigmann states later in the Complaint that it was Thomas, acting on the order of Governor Blagojevich, who instructed defendant Sheedy not to renew Steigmann's contract. (*Id.* at ¶ 63.) In alleging that someone other than the Democratic Party fired him, Steigmann has not sufficiently alleged that the Democratic Party engaged in joint activity with the State or its agents. *See Vickery,* 100 F.3d at 1344 (affirming district court grant of motion to dismiss; "[i]f the action prohibited under *Rutan* is the hiring, promoting or transferring or recalling of an individual based on his or her political association, since [the defendant

members of the Illinois Republican Party] did not hire, promote or transfer or recall anyone, their screening or recommending the hiring of employees ... is not the same as being 'jointly engaged with state officials in the prohibited action.' "). By alleging that someone other than the Democratic Party was responsible for his termination, Plaintiff would have pled himself out of court (assuming his claim was not otherwise deficient). *See Thompson,* 300 F.3d at 753 (Fed.R.Civ.P. 8 "requires only a short and plain statement showing that the plaintiff is entitled to relief, [but][i]f the plaintiff chooses to provide additional facts beyond this short and plain requirement, the defense may suggest that those facts demonstrate that the plaintiff is not entitled to relief" (internal citation omitted)); *Jefferson v. Ambroz,* 90 F.3d 1291, 1296 (7th Cir.1996) (if a plaintiff decides to plead particulars that show he has no claim, the plaintiff has pled himself out of court).

## IV. Sheedy's Motion to Dismiss

For the reasons stated above, Sheedy's motion to dismiss is granted because Plaintiff cannot demonstrate a deprivation of his First Amendment rights. In addition, Sheedy would be entitled to qualified immunity because Plaintiff did not establish that the alleged constitutional violation here was clearly established when Sheedy effected the non-renewal of Plaintiff's contract.

## CONCLUSION

For the foregoing reasons, the Court grants the State Officials' motions to dismiss, the Democratic Party's motion to dismiss, and Sheedy's motion to dismiss. Accordingly, the Court dismisses Plaintiff's complaint with prejudice.